IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TONY TURNAGE,** | : | |
| | : | |
| **Petitioner,** | : | **CIVIL NO. 1:CV-07-01391** |
| | : | |
| **v.** | : | **(Judge Rambo)** |
| | : | |
| **UNITED STATES ATTORNEY** | : | |
| **GENERAL,** *et al.,* | : | |
| | : | |
| **Respondents** | : | |

### M E M O R A N D U M

Before the court is an amended petition for writ of habeas corpus pursuant to

28 U.S.C. § 2241, filed by Petitioner Tony Turnage ("Turnage"), an inmate formerly

incarcerated at the Federal Correctional Institution at Schuylkill in Minersville,

Pennsylvania ("FCI-Schuylkill").[1]  Turnage is challenging the Bureau of Prisons

("BOP") and United States Parole Commission's ("Parole Commission") calculation

of his federal sentence.  In addition, Turnage alleges that he was illegally arrested in

---

[1]  In the petition, Turnage names as respondents the United States Attorney General, United States Bureau of Prisons, United States Marshals Service, and the United States Parole Commission.  The only proper respondent in a § 2241 action is the person having custody of the petitioner.  *See Rumsfeld v. Padilla*, 542 U.S. 426, 436 (2004).  At the time Turnage filed his petition, the warden of FCI-Schuylkill would have been the proper respondent.  Since Turnage has been released on parole, the person having custody of him is a member of the Parole Commission.  In light of the court's disposition of the petition, it will not require Turnage to amend his petition to reflect the proper respondent.

2004 and that the Parole Commission conducted an illegal revocation hearing.  For the reasons set forth below, the amended petition will be denied.

## I.   **Background**

On December 3, 1987, Turnage was sentenced in the United States District Court for the District of Maryland to two fifteen (15) year terms of imprisonment for robbery of a savings and loan and aiding and abetting, *see* 18 U.S.C. §§ 2113(a)(g) & 2, and larceny of a savings and loan and aiding and abetting, *see* 18 U.S.C. §§ 2113(b)(g) & 2.  (*See* Doc. 10-2 at 41.)[2]  The court directed that, under the provisions of 18 U.S.C. § 4205(b)(1), Turnage would be eligible for parole at the expiration of three (3) years.  (*Id*. at 43.)

The BOP merged the two 15-year terms for sentencing purposes into a single, aggregate term, commencing on the date it was imposed, December 3, 1987, and running continuously since that date.  (*Id*. at 45.)  Turnage also received ninety-nine (99) days of jail credit toward his federal sentence, resulting in a full term expiration date of August 25, 2002.  (*Id*. at 47.)  Further, the BOP determined that Turnage was

---

[2]  Respondents have submitted the declaration of Cheryl A. Pauley, policy and correspondence specialist at the Designation and Sentence Computation Center in Grand Prairie, Texas, which verifies the accuracy of the sentence computation at issue in this case.  (Doc. 10-2 at 36-39.)  Also attached are various BOP documents relevant to Turnage's claims.  (*Id*. at 40-117.)

eligible for parole on August 25, 1990, or three years from the commencement of his

sentence on December 3, 1987, less the 99 days of jail credit.  (*Id*.)

In a Notice of Action dated September 30, 1993, the Parole Commission

directed that Turnage's parole effective date be set at December 22, 1993.  (*Id*. at 49.)

Turnage was released on parole on that date, with 3,168 days remaining to his full

term date of August 25, 2002.  (*Id*. at 47.)

After he was paroled from his federal sentence, Turnage committed several

state offenses for which he was imprisoned in a state institution from July 22, 1994 to

April 4, 1995 (for an assault and battery conviction), and from June 25, 1996 to

October 18, 1997 (for a burglary conviction).  (*Id*. at 56, 62.)  As a result, on April 9,

1998, the Parole Commission issued a parole violator warrant charging Turnage with

violations of the conditions of his parole.  (*Id*. at 51.)  The United States Marshals

Service arrested Turnage on that warrant on May 7, 1998.  (*Id*. at 53.)

After conducting a parole revocation hearing in October 1998, on December 8,

1998, the Parole Commission issued a Notice of Action ordering the following:

"Revoke parole.  None of the time spent on parole shall be credited.  Continue to a

presumptive parole after the service of 60 months on 02-01-2002."  (*Id*. at 56.)

Consequently, the BOP recalculated Turnage's sentence by beginning the

3

computation on May 7, 1998 (the date the warrant was executed) and adding the 3,168 days remaining on his federal sentence. (*Id*. at 60.)  This computation resulted in a full term date of January 7, 2007. (*Id*.)  Further, Turnage was credited with the time he spent in state custody from July 22, 1994 to April 4, 1995, and from June 25, 1996 to October 18, 1997. (*Id*. at 62.)  Accordingly, the street time he spent on parole from December 22, 1993 (date of federal parole) to July 21, 1994, from April 4, 1995 (first release from state custody) to June 25, 1996, and from October 18, 1997 (second release from state custody) to May 7, 1998 (arrest on federal parole violator warrant) was forfeited. (*Id*.)  The National Appeals Board affirmed these orders by Notice of Action on Appeal dated March 17, 1999, and modified the presumptive parole date after 60 months from February 1, 2002, as originally ordered, to May 7, 2001. (*Id*.)

In a Notice of Action dated November 15, 2000, the Parole Commission granted a parole effective date of May 7, 2001. (*Id*. at 64.)  However, in a subsequent Notice of Action dated June 27, 2001, the Parole Commission retarded the parole effective date of May 7, 2001 by ninety-one (91) days to August 6, 2001, due to a violation by Turnage of the rules of FCI-Schuylkill. (*Id*. at 66.)

Turnage was released on parole on August 6, 2001, with 1,980 days remaining to his full term date of January 7, 2007. (*Id*. at 60.)  However, on September 17,

2004, the Parole Commission issued another parole violator warrant charging

Turnage with violations of the conditions of his parole.  (*Id*. at 68.)  The United States

Marshals Service, accompanied by a Maryland Trooper, arrested Turnage on

December 3, 2004 on the parole violator warrant and state charges of resisting arrest.

(*Id*. at 78.)  Turnage was taken into state custody at that time on the resisting arrest

charges, and as a result the parole violator warrant was lodged with state authorities

as a detainer.  (*Id*. at 78, 104.)  On March 23, 2005, the state charges were *nolle*

*prossed* by the Baltimore City Circuit Court, and Turnage was taken into federal

custody.  (*Id*.)  Thus, the parole violator warrant was not executed until March 24,

2005.  (*Id*. at 69.)

The Parole Commission conducted a parole revocation hearing on July 19,

2005.  (*Id*. at 107.)  Prior to that date, the Parole Commission had granted Turnage

two continuances from hearings scheduled in May and June 2005.  (*Id*.)  Turnage

requested a third continuance before the July hearing date, but the Parole Commission

denied his request.  (*Id*.)  When the hearing examiner called Turnage and his counsel

into the hearing on July 19, 2005, Turnage fired his counsel and requested another

continuance.  (*Id*.)  The hearing examiner advised Turnage that she did not have the

authority to overturn a Parole Commission decision on the third continuance, and as a

result, the hearing was to be conducted on that date.  (*Id*. at 107-08.)  Turnage then

stated that he would not participate in the hearing.  (*Id*. at 108.)  The hearing

examiner informed him that she would go forward despite his absence and make

findings of fact if the record supported such findings.  (*Id*.)  Turnage then left the

hearing room, and his counsel indicated that he would not participate in the hearing

because Turnage had fired him.  (*Id*.)

As a result of the hearing, on August 9, 2005, the Parole Commission issued a

Notice of Action ordering the following: "Revoke parole.  None of the time spent on

parole shall be credited.  Continue to a presumptive re-parole November 24, 2007

after service of 32 months."  (*Id*. at 71.)  Consequently, the BOP recalculated

Turnage's sentence from March 24, 2005, the date the parole violator warrant was

executed.  (*Id*. at 75.)  This computation resulted in a full term date of May 5, 2010.

(*Id*.)

When the Parole Commission was informed that the state charges of resisting

arrest had been *nolle prossed*, it issued a Notice of Action crediting Turnage with the

111 days he spent in state custody from December 3, 2004 to March 23, 2005,

advanced the presumptive parole date, and granted a parole effective date of July 1,

2007 after service of 32 months.  (*Id*. at 80.)

6

On June 29, 2007, Turnage was released on parole with 1,039 days remaining to his full term date of May 5, 2010 plus two (2) public law days for release on the weekend.  (*Id*. at 75.)

Turnage initially filed his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 in the Eastern District of Pennsylvania on November 14, 2006, while he was still incarcerated at FCI-Schuylkill.  (*See* Doc. 1.)  The Eastern District transferred the case to this court on July 31, 2007, (*see id.*), and by order dated September 27, 2007, the court directed Turnage to file an amended petition, (*see* Doc. 3).  Turnage filed his amended habeas petition on November 6, 2007.  (Doc. 6.)  On December 20, 2007, an order to show cause was issued, directing the Respondents to reply to Turnage's petition.  (Doc. 7.)  The matter is now ripe for disposition.

## II.   **Discussion**

A petition for writ of habeas corpus under § 2241 is the proper vehicle for relief "where petitioner challenges the effect of events 'subsequent' to his sentence," *Gomori v. Arnold*, 533 F.2d 871, 874 (3d Cir. 1976), and where he challenges the execution of his sentence rather than its validity, *see United States v. Addonizio*, 442 U.S. 178, 185-88 (1979); *Coady v. Vaughn*, 251 F.3d 480, 485 (3d Cir. 2001).  Thus, Turnage has properly invoked section 2241 to challenge the calculation of his federal

7

sentence by the BOP and has done so in the proper district, where he was imprisoned. *Barden v. Keohane*, 921 F.2d 476, 478-79 (3d Cir. 1990).

### A.    Exhaustion of Administrative Remedies

In their response to the amended habeas petition, Respondents assert that Turnage has failed to exhaust his administrative remedies with respect to all claims raised in the amended petition.  Thus, because exhaustion of administrative remedies is a threshold issue, the court will first address whether Turnage exhausted his administrative remedies prior to filing the instant amended petition.

Despite the absence of a statutory exhaustion requirement attached to § 2241, courts have consistently required a petitioner to exhaust administrative remedies prior to bringing habeas claims under § 2241.  *Callwood v. Enos*, 230 F.3d 627, 634 (3d Cir. 2000); *Moscato v. Federal Bureau of Prisons*, 98 F.3d 757, 760 (3d Cir. 1996). Exhaustion is required "for three reasons: (1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and (3) providing agencies the opportunity to correct their own errors fosters administrative autonomy." *Moscato,* 98 F.3d at 761-62 (citing *Bradshaw v. Carlson*, 682 F.2d 1050, 1052 (3d Cir. 1981)).

8

In order for a federal prisoner to exhaust his administrative remedies, he must comply with 28 C.F.R. § 542.  *See* 28 C.F.R. § 542.10, *et seq.*; *Lindsay v. Williamson*, No. 1:CV-07-0808, 2007 WL 2155544, at *2 (M.D. Pa. July 26, 2007).  An inmate first must informally present his complaint to staff, and staff shall attempt to informally resolve any issue before an inmate files a request for administrative relief.  28 C.F.R. § 542.13(a).  If unsuccessful at informal resolution, the inmate may raise his complaint with the warden of the institution where he is confined.  *Id*. at § 542.14(a).  If dissatisfied with the response, he may then appeal an adverse decision to the Regional Office and the Central Office of the BOP.  *Id*. at §§ 542.15(a) and 542.18.  No administrative appeal is considered finally exhausted until a decision is reached on the merits by the BOP's Central Office.  *See Sharpe v. Costello*, No. 08-1811, 2008 WL 2736782, at *3 (3d Cir. July 15, 2008).

The record reflects that Turnage filed one request for administrative remedy while he was in BOP custody.[3]  That request does not pertain to any claims in the instant petition.

---

[3] Respondents have submitted the declaration of Adam J. Ackley, attorney advisor at the Consolidated Legal Center in Allenwood, Pennsylvania, which verifies the accuracy of all the administrative remedies pursued by Turnage, and the responses thereto, while he was in BOP custody.  (Doc. 10-2, Ex. 1.)  Also attached as exhibits are the relevant SENTRY computer-generated records of Turnage's exhaustion attempts.  (*Id*.)

9

On March 5, 1993, while incarcerated at the United States Penitentiary in Lewisburg, Pennsylvania ("USP-Lewisburg"), Turnage filed request for administrative remedy 43547-F1, requesting an investigation of a prior incident and a transfer to the A/O Unit.  (Doc. 10-2 at 35.)  That request was denied on the same day for failure to attempt informal resolution prior to filing the grievance.  (*Id*.)  Turnage did not appeal this decision.  (*Id*.)

Respondents claim that the record of Turnage's requests for administrative remedies while in BOP custody shows that he has not properly exhausted all available administrative remedies with respect to the instant claims, and therefore, the amended petition should be dismissed.  In fact, Respondents' evidence indicates that Turnage has not even attempted to address his claims through the BOP.

Although, as stated above, no statute requires prisoners to exhaust all administrative remedies when they file petitions pursuant to 28 U.S.C. § 2241, as Turnage has, courts have created rules that prisoners are ordinarily required to abide by "to ensure that prisoners do not circumvent the appropriate agencies and needlessly swamp the courts with petitions for relief."  *Moscato*, 98 F.3d at 761.  Notably, exhaustion of administrative remedies is not required when administrative procedures are unavailable or incompetent to provide adequate redress, or where

exhaustion would be futile.  *See Gambino v. Morris*, 134 F.3d 156, 171 (3d Cir. 1998).  However, as Turnage has not filed a reply disputing Respondents' contention that he has not exhausted his administrative remedies, the court sees no reason to believe that exhaustion of administrative remedies in this case would be futile. Moreover, in their response to the amended petition, Respondents alternatively address the merits of Turnage's claims.  Because the court concludes that the instant amended petition is without merit, it need not determine whether to otherwise excuse Turnage's failure to exhaust his administrative remedies with respect to the instant claims.

**B.    Merits**

Turnage sets forth three claims in his amended habeas petition: (1) the BOP and Parole Commission improperly calculated his federal sentence; (2) his 2004 arrest by federal and state authorities was illegal; and (3) the Parole Commission conducted an illegal revocation hearing.  The court will discuss these claims in turn.

**1.    Calculation of Turnage's Sentence**

Turnage claims that the BOP and Parole Commission improperly recalculated his federal sentence after his parole was revoked on two separate occasions.  After careful review, the court disagrees.

11

The Attorney General is responsible for computing federal sentences for all

offenses committed after November 1, 1987, 18 U.S.C. § 3585; *United States v.*

*Wilson*, 503 U.S. 329, 331-32 (1992), and the Attorney General has delegated this

authority to the Director of the Bureau of Prisons, 28 C.F.R. § 0.96 (1992).

Computation of a federal sentence is governed by 18 U.S.C. § 3585, and consists of

the following two-step process: (1) a determination of the date on which the federal

sentence commences, and (2) consideration of any credit to which petitioner may be

entitled.  *Chambers v. Holland*, 920 F. Supp. 618, 621 (M.D. Pa. 1996).  A federal

sentence commences "on the date the defendant is received in custody awaiting

transportation to, or arrives voluntarily to commence service of sentence at, the

official detention facility at which the sentence is to be served."  18 U.S.C. § 3585(a).

In the instant amended petition, Turnage argues that the BOP and Parole

Commission improperly calculated his federal sentence.  Specifically, Turnage claims

that when he received the first parole violator term of 60 months, set forth in the

Parole Commission's Notice of Action dated December 8, 1998, he had eight (8)

years, eight (8) months remaining on his sentence.  (Doc. 6-2 at 2-3.)  He further

claims that the 60 month parole violator term plus an additional three (months) due to

a prison disciplinary matter, or as Turnage states, "five (5) years and three (3)

12

months," should have been deducted from the 8 years, 8 months remaining on his sentence, leaving a balance of three (3) years, five (5) months remaining on his sentence when he was released on August 6, 2001.  (*Id*. at 3, 6.)  To that end, Turnage inexplicably claims that he had served five (5) years, three (3) months on his sentence between the time his parole was revoked in 1998 and when he was released on parole on August 6, 2001.  (*Id*. at 3.)  As relief, he seeks two (2) years of credit on his sentence.  (*Id*. at 7.)

At the time Turnage's sentence commenced on December 3, 1987, Turnage was to serve fifteen (15) years minus ninety-nine (99) days of jail credit, or 5,379 days.  This term resulted in a full term expiration date of August 25, 2002.  As a result, when Turnage was released on parole for the first time on December 22, 1993, or 2,211 days later, he had 3,168 days remaining to his full term date.

When Turnage's parole was revoked, as set forth in the Parole Commission's Notice of Action dated December 8, 1998, Turnage was informed that none of the time he spent on parole would be credited toward his sentence.  In addition, he was informed that a presumptive parole would not begin until after he had served 60 months from February 1, 2002.  That date, however, was modified to May 7, 2001, by Notice of Action on Appeal dated March 17, 1999.  As a result of the parole

13

revocation, the BOP recalculated his sentence by beginning the computation on May 7, 1998 (the date the parole violator warrant was executed) and adding the 3,168 days remaining on his sentence. This computation resulted in a full term date of January 7, 2007. Thus, when Turnage was released on parole again on August 6, 2001, he had served another 1,188 days on his sentence. This 1,188 days, or three (3) years, three (3) months, is contrary to Turnage's claim that he should be credited with two (2) years because he had somehow served five (5) years, three (3) months between the May 7, 1998 (the date the parole violator warrant was executed) and August 6, 2001 (the date he was re-released on parole). Therefore, Turnage's claim here fails.

Turnage also claims that he did not receive credit on his federal sentence for the time he spent in state custody from December 3, 2004 to March 24, 2005. The record reflects that a joint task force of federal and state authorities arrested Turnage on December 3, 2004 for violating the conditions of his parole. At that time, he was taken in state custody on state charges of resisting arrest. He remained in state custody until March 23, 2005, at which time he was taken into federal custody on the parole violator warrant. After a parole revocation hearing, the Parole Commission issued a Notice of Action on August 9, 2005, revoking his parole and informing Turnage that none of his time spent on parole would be credited. However, the

Parole Commission amended that Notice of Action on December 21, 2006, to reflect an additional 111 days of credit on his federal sentence for the time he spent in state custody from December 3, 2004 to March 23, 2005.  (*See* Doc. 10-2 at 80, 83.)  Upon review of the record, it is clear that Turnage did, in fact, receive credit for this time spent in state custody, and thus, his claim here fails.

## 2.    2004 Parole Violation Arrest

Turnage claims that his December 3, 2004 arrest by federal and state authorities was illegal because a state officer was involved in the arrest and, in fact, took him into state custody for resisting arrest rather than into federal custody under the parole violator warrant.  He argues that the parole violator warrant was rendered invalid when United States Marshals "lost custody" of him and "lost jurisdiction to enforce any kind of sanction" on him after he was placed in state custody.  In support, Turnage provides the following account of the arrest:

> On/about the date December 3, 2004, the U.S. Marshal Service in an attempt to take me into custody, had not announced there [sic] authority; they were dressed up like thugs, I proceeded to run, and eventually boarded a cab, and they ordered me out onto the street and onto the pavement and proceed[ed] to cuff me, while there [sic] guns were drawn. While in this position, a city or state policeman out of uniform began to beat me with a stick.  They, the Marshals (and the other man), proceeded to take me to the Marshals' office with your petitioner in custody.  After arriving at the office, they instructed me to sign a Marshals' return for acknowledgment of service form.  Upon complaint of pain that I was

feeling from the beating by the man, someone suggested that petitioner be taken to the hospital for examination . . . . The man that welled the stick is the one that transferred me to the hospital. Petitioner was treated and released from the hospital in custody of the same escort and consequently was transported to the local Baltimore City detention center . . . and "charged" with local state charges of resisting arrest born out of the "original" retaking of the U.S. Marshals. Petitioner remained there in custody until the impending charges, on/about March 23, 2005, were dismissed. The next day I was returned back to the custody of the U.S. Marshals . . . .

(Doc. 6-2 at 3-4.)

The record reflects that a joint task force of federal and state authorities arrested Turnage on December 3, 2004. By Turnage's own account, he signed the Marshals' return for acknowledgment of service form on December 3, 2004. However, because he was taken into state custody on that date, the parole violator warrant was not executed, rather, it was lodged with state authorities as a detainer. Once Turnage was placed in primary federal custody on March 24, 2005, the warrant was executed. There is nothing in the record, nor in any legal authority, to support Turnage's claim that he was not properly arrested by federal authorities, simply because a state officer was present at the arrest and took him into custody for resisting arrest.[4] To the extent that Turnage is claiming that he should have received credit

---

[4] In his petition, Turnage has not made any claim against the state officer with respect to the arrest.

16

toward his federal sentence for the time he spent in state custody on the resisting

arrest charge, the record clearly reflects that Turnage did receive credit for that time.

(*See* Doc. 10-2 at 80, 83.)  Thus, this claim fails.

### 3.   **Parole Revocation Hearing**

Turnage claims that his right to due process was violated because the Parole

Commission's hearing examiner conducted his revocation hearing on July 19, 2005,

in his absence.  Upon review of this claim, the court finds that Turnage's claim fails.

Due process in the context of a parole revocation is different than due process

in the context of a criminal prosecution.  The distinguishing factor is that

"[r]evocation deprives an individual, not of the absolute liberty to which every citizen

is entitled, but only of the conditional liberty properly dependent on observance of

special parole restrictions."  *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972).  Further,

parole revocation is an administrative procedure which occurs after a criminal

prosecution is complete.  Thus, the "full panoply of rights" due a defendant during

criminal proceedings does not apply to parole revocations.  *Id*.  While not entitled to

the "full panoply of rights," a parolee is entitled to certain procedural protections,

such as notice of the violations, disclosure of the evidence against him, an

opportunity to be heard and to present witnesses and evidence, the right to confront

17

and cross-examine witnesses, a "neutral and detached" hearing, and a written statement by the factfinders as to the evidence relied on and the reasons for revoking parole. *Id*. at 481-89.  The Due Process Clause, however, is not offended when parole violations are found "by a judge under a preponderance of the evidence standard, [and] not by a jury beyond a reasonable doubt." *United States v. Dees*, 467 F.3d 847, 855 (3d Cir. 2006).  Parolees in revocation proceedings also face a greater range of evidence that may be admissible against them and have no right to a jury or to a right against self-incrimination. *United States v. Loy*, 237 F.3d 251, 260 (3d Cir. 2001).

In the instant petition, Turnage claims that he was not afforded the opportunity to be heard when the hearing examiner conducted his parole revocation hearing in his absence.  In support, Turnage argues that he refused to participate in his parole revocation hearing because he understood that the hearing examiner was not going to credit him with the time he served in state custody from December 3, 2004 to March 24, 2005.  He claims he had been compelled to seek several continuances of the hearing because he knew the examiner was not going to credit his sentence with that time.

There is no authority to suggest that a parolee's voluntary absence from his parole revocation hearing implicates a due process violation.  Moreover, the court

18

ascertains no grievous loss suffered by Turnage due to his voluntary absence from the revocation hearing.  The harm he claims to have suffered, namely that he did not receive credit for the time he spent in state custody from December 3, 2004 to March 24, 2005, was alleviated when the Parole Commission amended its Notice of Action in December 2006 to reflect credit to his federal sentence for that time period.  As a result, this claim is moot and will be denied.

## III.   <u>Conclusion</u>

For the reasons set forth above, the court will deny Turnage's amended petition for writ of habeas corpus.

An appropriate order follows.


                                        s/Sylvia H. Rambo
                                        United States District Judge

Dated:  March 9, 2009.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TONY TURNAGE,** | : | |
| | : | |
| **Petitioner,** | : | **CIVIL NO. 1:CV-07-01391** |
| | : | |
| **v.** | : | **(Judge Rambo)** |
| | : | |
| **UNITED STATES ATTORNEY** | : | |
| **GENERAL,** *et al.*, | : | |
| | : | |
| **Respondents** | : | |

## O R D E R

**AND NOW**, this 9th day of March, 2009, upon consideration of the amended

petition for writ of habeas corpus (Doc. 6), and in accordance with the accompanying

memorandum, **IT IS HEREBY ORDERED THAT**:

    1) The amended petition for writ of habeas corpus (Doc. 6) is **DENIED**.

    2) The Clerk of Court is directed to **CLOSE** this case.

                                         s/Sylvia H. Rambo
                                       United States District Judge

.